# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAWN T. WALKER, :
        *Plaintiff*, : CIVIL ACTION
         :
   v. :
         : No. 13-7556
FRANK REGAN, :
        *Defendant*. :

# MEMORANDUM

PRATTER, J.                                                                                                    FEBRUARY 27, 2019

Actions have consequences, both for prison inmates—who are subject to discipline when they threaten to harm their cellmates—and prison officials—who may be civilly liable if they retaliate against inmates engaging in protected speech. This case shows that though inmates and officials view the world from opposite vantages, what they say, and how they say it, matters in quite the same vein.

Shawn T. Walker's claims arise from incidents that occurred during his incarceration at SCI-Graterford, which was operated by the Pennsylvania Department of Corrections. Over more than five years and by way of five amended complaints, Mr. Walker, appearing *pro se*,[1] has brought claims against various DOC officials. Only two claims remain, each alleging First Amendment retaliation by retired prison unit manager Frank Regan. The Court will dismiss Mr. Walker's first claim—alleging retaliation for his objection to losing his single occupancy cell—and the Court will allow Mr. Walker's second claim—alleging retaliation for his filing a lawsuit against Mr.

---

[1] The Court commends Mr. Walker for his diligence while litigating his claims without the assistance of counsel.

1

Regan—to proceed. The Court also rejects Mr. Regan's argument seeking to dismiss the request for punitive damages.

## BACKGROUND

Mr. Walker is serving a life sentence.[2] His claims, though both for First Amendment retaliation, stem from two separate incidents involving Frank Regan, a former unit manager at SCI-Graterford. The first retaliation claim arose in 2013, the second in 2014.

### I. Mr. Walker's 2013 Retaliation Claim

On July 3, 2013, Mr. Walker met with Mr. Regan and several other prison officials, including (1) Mr. Walker's then-counselor, Patricia Connor-Council, (2), Mr. Walker's former counselor, Pamela Sellers, and (3) Corrections Officer Lieutenant Patrick Fina. The meeting, or "staffing," was arranged to determine whether Mr. Walker should retain his "Z-Code" status, which allowed him a single cell. Mr. Walker had previously been given a Z-Code designation as part of his transition from a restricted custody cell unit—where he was held for 20 years and each cell was single occupancy—to the prison's general population block. Mr. Walker was also assigned "custody level" 3, an intermediate custody level meaning that he could be housed with inmates with custody levels 2, 3, or 4.[3] At the time of the staffing, prison officials were working to limit the number of inmates with Z-Code designations to those actually requiring a single cell. Because Mr. Walker's transition to the general population had, according to Mr. Regan, "gone smoothly," MSJ at p. 5, the officials present at the July 3 staffing believed Mr. Walker likely did not have a continued need for Z-Code designation.

---

[2] Mr. Walker's claims arose when he was housed at SCI-Graterford. He is currently held at SCI-Phoenix.

[3] Custody level 2 is the lowest custody level assigned to inmates at SCI-Graterford. See MSJ Ex. D4 at ¶ 6.

2

During the staffing, the prison officials asked Mr. Walker to voluntarily cede his Z-Code status.[4] Mr. Walker refused. According to Ms. Connor-Council's contemporaneous notes on the staffing, Mr. Walker threatened, "[i]f you give me a celly it's going to be a problem." MSJ Ex. D4-2.[5] Officer Fina similarly recalls that Mr. Walker said "something to the effect that he would hurt any cellmate assigned to his cell." MSJ Ex. D5 at ¶ 3. Mr. Regan recalls generally that Mr. Walker "threatened harming or killing a cellmate" if one was assigned, MSJ Ex. D7 at ¶ 5, and Ms. Sellers likewise remembers that she interpreted Mr. Walker's comments "as hostility and threatened hostility toward a cellmate if [Mr. Walker] were to receive a cellmate." MSJ Ex. D8 at ¶ 6. Mr. Walker himself acknowledged that he "may have" said that it "could be dangerous to somebody else" if he was assigned a cellmate. MSJ Ex. D1 at 16:22–24, 17:1–4. According to Ms. Connor-Council, when Mr. Walker left the staffing, he "appeared very angry and slammed the door on his way out." MSJ Ex. D4 at ¶ 8.

After the staffing with Mr. Walker, the officials present (and several other prison officials) voted to recommend a course of action to the prison superintendent. Of the nine officials who voted on whether to recommend that Mr. Walker keep his Z-Code status (and a single occupancy cell), all but one voted in favor of leaving the Z-Code in place. See MSJ Ex. D4-2. Additionally, the voting officials all recommended (with one abstention) that (1) Mr. Walker's custody level should be increased from 3 to 4 and (2) Mr. Walker should receive an "H-Code" designation. Id. Both the increased custody level and the H-Code designation indicated that Mr. Walker was "high

---

[4] According to Mr. Regan, Mr. Walker's agreement to remove his Z-Code status was "not required but would support his transition to double-celling if the Z Code was in fact removed." MSJ Ex. D7 at ¶ 4.

[5] In her declaration, Ms. Connor-Council recalled that Mr. Walker said, "give me a celly and watch and it's going to be a problem." MSJ Ex. D4 at ¶ 8. Although the current statement's wording is nominally different from the original, Ms. Connor-Council recalled then and still recalls today that Mr. Walker made a threatening assertion towards a prospective "celly," or cellmate.

3

risk" with a "high potential for repeating a demonstrated assaultive behavior." MSJ Ex. D3 at ¶ 8. According to Ms. Connor-Council, the officials voted to add the H-Code designation "[b]ased on inmate Walker's behavior during staffing[.]" MSJ Ex. D4-2. See also MSJ Ex. D8 at ¶ 6 (stating that "[w]hat [Mr. Walker] said and how he said it led [Ms. Sellers] to conclude that it was warranted to increase his custody level from a 3 to a 4 and to add an H Code related to the security concern that [Mr. Walker] would pose to another inmate if housed together"). Mr. Regan similarly states he "voted for an H Code in [Mr. Walker's] case based on his convictions include[ing] murder and aggravated assault and his threat/behavior during his July 3, 2013 staffing." MSJ Ex. D3 at ¶ 8.

Although eight prison officials voted in favor of adding an H-Code designation to Mr. Walker and increasing his custody level, the final decision belonged to the prison superintendent. See id. at ¶ 6; see also MSJ Ex. D1 at 33:14–20; MSJ Ex. D2 at ¶ 7; MSJ Ex. D4 at ¶ 11; MSJ Ex. D6 at ¶ 5; MSJ Ex. D7 at ¶¶ 3, 11. The superintendent, following the recommendations of the prison officials, left in place Mr. Walker's Z-Code, increased his custody level to 4, and assigned Mr. Walker an H-Code.

Mr. Walker argues that Mr. Regan made the decision to heighten Mr. Walker's custody level and designate him with an H-Code as retaliation for his refusal to accept removal of his Z-Code.

## II. Mr. Walker's 2014 Retaliation Claim

Beginning in January 2014, Mr. Walker was again housed in B-Block of the prison, where Mr. Regan was unit manager. B-Block held between 550 and 600 inmates, most of whom were custody level 3. By that time, prison officials had lowered Mr. Walker's custody level back to level 3 and had removed Mr. Walker's H-Code designation.

4

Around the same time, Mr. Walker initiated this lawsuit alleging, among other things, a First Amendment retaliation claim against Mr. Regan. After filing an application to proceed *in forma pauperis* on December 23, 2013, Mr. Walker filed his first complaint on February 7, 2014. See Doc. No. 6. After a delay caused by motion practice about the timing of issuing summonses, Mr. Regan received service of the complaint on June 10, 2014. See Doc. No. 14.

On June 27, 2014, seventeen days after service of the Complaint on Mr. Regan—and one day after Mr. Regan's attorney filed a motion to dismiss—Mr. Regan approached Mr. Walker and instructed him to prepare to move to Upper H-Block, another cell block on the other side of the prison. The parties dispute the cause for the move. According to Mr. Walker, the move was another instance of retaliation by Mr. Regan, this time initiated in response to Mr. Walker suing Mr. Regan. Mr. Regan counters that he needed to move a Z-Coded inmate to B-Block, and Mr. Walker's move was necessary to create space and because it was "prudent to exchange one Z coded inmate for another[.]" MSJ Ex. D7 at ¶ 13.

When Mr. Regan instructed Mr. Walker to pack up his things, Mr. Walker responded by saying, "[w]hy are you messing with me?" and "I need to talk to somebody about this[.]" MSJ Ex. D1 at 41:2–6. Mr. Walker then sat down on his bed, at which point Mr. Regan began "screaming through" the cell window, yelling "are you going to move?" Id. at 45:6–12; see also id. at 46:10–15. Mr. Regan asserts that Mr. Walker did not simply sit idly on his bed, but instead that Mr. Walker also "became aggressive[,] . . . yelling and coming towards [Mr. Regan] as if [Mr. Walker] was going to attack [Mr. Regan]." MSJ Ex. D7 at ¶ 14.

Eventually, Mr. Regan left the cell without Mr. Walker. Mr. Regan returned about fifteen minutes later, this time with a group of other guards. After the guards opened Mr. Walker's cell, they patted him down and took him to a restricted custody cell unit. Mr. Walker eventually learned

that he had been charged with misconduct by Mr. Regan for making threats and refusing an order. It appears that Mr. Walker was never actually moved to Upper H-Block and, after his release from the restricted custody unit, Mr. Walker was moved to D-Block instead.

Mr. Walker alleges that the attempted move to Upper H-Block and the misconduct charge were used by Mr. Regan to retaliate against Mr. Walker for suing Mr. Regan.

## LEGAL STANDARD

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a "sufficient evidentiary basis" on which a reasonable factfinder could return a verdict for the non-moving party. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it "might affect the outcome of the case under governing law." Id. (citing Anderson, 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party and draw all inferences in that party's favor. Id. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010) (citing Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989)).

The movant bears the "initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Where the non-moving party bears the burden of proof on a particular issue, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—

that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the non-moving party must set forth specific facts establishing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate unless the non-moving party makes a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

*Pro se* litigants such as Mr. Walker are "held to 'less stringent standards' than trained counsel." Benckini v. Hawk, 654 F. Supp. 2d 310, 316 n.1 (E.D. Pa. 2009) (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972)). The Court stands prepared to "apply the applicable law, irrespective of whether a *pro se* litigant has mentioned it by name." Holley v. Dep't of Veteran Affairs, 165 F.3d 244, 247–48 (3d Cir. 1999) (citations omitted). Even still, on a motion for summary judgment, "a *pro se* plaintiff is not relieved of his obligation under Rule 56 to point to competent evidence in the record that is capable of refuting a defendant's motion for summary judgment." Dawson v. Cook, 238 F. Supp. 3d 712, 717 (E.D. Pa. 2017) (citation omitted). "[M]erely because a non-moving party is proceeding *pro se* does not relieve him of the obligation under Rule 56(e) to produce evidence that raises a genuine issue of material fact." Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000); see also Zilich v. Lucht, 981 F.2d 694, 696 (3d Cir. 1992) (stating that despite liberal construction of the complaint, *pro se* plaintiff "still has before him the formidable task of avoiding summary judgment by producing evidence

'such that a reasonable jury could return a verdict for [him].'") (quoting Anderson, 477 U.S. at 248).

## DISCUSSION

Mr. Walker has two retaliation claims. As to the first claim, relating to the 2013 decision to assign Mr. Walker an H-Code designation, the Court will grant the summary judgment motion because Mr. Walker cannot establish that his protected speech was a substantial factor in his H-Code designation. And for the second claim, stemming from the attempt to move Mr. Walker to Upper H-Block and a resulting misconduct writeup, the Court will deny summary judgment because the circumstances surrounding Mr. Walker's relocation and the misconduct charge are sufficient to support an inference of retaliatory causation. The Court also rejects Mr. Regan's argument that punitive damages are not warranted as a matter of law.[6]

### I. Legal Standard

"To state a claim for retaliation, a prisoner must allege that: (1) he was engaged in constitutionally protected conduct, (2) 'he suffered some 'adverse action' at the hands of prison officials,' and (3) 'his constitutionally protected conduct was 'a substantial or motivating factor' in the decision' to take that action." Wisniewski v. Fisher, 857 F.3d 152, 156 (3d Cir. 2017) (quoting Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001)). "Because motivation is almost never subject to proof by direct evidence," plaintiffs must often "rely on circumstantial evidence to prove a retaliatory motive." Watson v. Rozum, 834 F.3d 417, 422 (3d Cir. 2016). Examples of

---

[6] In addition to arguing that disputed facts demand denial of summary judgment, Mr. Walker asserts that he has not had an opportunity to conduct discovery and so summary judgment is premature. But Mr. Walker has submitted—and received responses to—interrogatories and requests for production, see MSJ Ex. D2, and requests for admission. See MSJ Ex. D3. Further, the Court has allowed Mr. Walker significant leeway in conducting discovery after the discovery deadline. See e.g., Doc. Nos. 103, 109, 122, 125. All previous discovery disputes have been resolved, so Mr. Regan's motion for summary judgment is now ripe.

circumstantial evidence include "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." Id. (citing Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)).

Once an inmate makes a *prima facie* case for retaliation, the defendant can rebut that showing using the "same decision defense." Id. For the same decision rule to apply, the prison official must carry his or her burden of showing that he or she "would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334. Nonetheless, even if the prison official can establish some evidence that the same decision would have followed absent protected speech, if "a reasonable fact finder could conclude that the misconduct was issued in retaliation for [a protected] statement . . . and not in furtherance of legitimate penological goals," then the official cannot carry his or her burden on a motion for summary judgment. Watson, 834 F.3d at 426.[7]

---

[7] The Third Circuit Court of Appeals has described the "same decision" rule in terms suggesting it may be an affirmative defense, see Watson v. Rozum, 834 F.3d 417, 422 (3d Cir. 2016) (referring to rule as "same decision defense"), but it appears that neither the circuit court nor any district court in this circuit has explicitly held that a defendant's answer must include the defense to avoid waiver. See Delhagen v. McDowell, No. 08-285, 2010 WL 3829390, at *1 (M.D. Pa. Sept. 24, 2010) (granting leave to amend answer "due to confusion over whether the 'same decision' defense is an affirmative one that must be pled in an answer"). Despite the language used by the court of appeals in Watson, 834 F.3d at 422, the case in which the Third Circuit Court of Appeals adopted the "same decision" rule, Rauser v. Horn, frames the analysis as part of a "burden-shifting framework" rather than as application of an affirmative defense. 241 F.3d 330, 333–34 (3d Cir. 2001) (adopting "burden-shifting framework" from Mount Healthy Bd. of Ed. v. Doyle, 429 U.S. 274, 287 (1977), by which the defendant can rebut the plaintiff's *prima facie* case by "prov[ing] by a preponderance of the evidence that it would have taken the same disciplinary action even in the absence of the protected activity").

## II. Mr. Walker's 2013 Retaliation Claim

Mr. Walker's only actionable exercise of protected speech was his refusal to give up his Z-Code status.[8] Mr. Walker suffered adverse action, in the form of his H-Code designation and heightened custody level. And the adverse action came immediately after Mr. Walker refused to agree to give up his Z-Code status. But summary judgment is appropriate because the decision to take adverse action against Mr. Walker was the prison superintendent's, not Mr. Regan's, and Mr. Walker's speech was not a substantial factor in the prison superintendent's decision.[9]

Mr. Regan did not decide to take the at-issue adverse action, because he did not assign Mr. Walker H-Code status. Although Mr. Regan could make a <u>recommendation</u> to assign a prisoner an H-Code, the final decision rested with the prison superintendent. <u>See</u> MSJ Ex. D3 at ¶ 6; MSJ Ex. D1 at 33:14–20; MSJ Ex. D2 at ¶ 7; MSJ Ex. D4 at ¶ 11; MSJ Ex. D6 at ¶ 5; MSJ Ex. D7 at ¶¶ 3, 11. The superintendent's review was not a rubber stamp. <u>See</u> MSJ Ex. D4 at ¶ 11; MSJ Ex. D6 at ¶ 5; MSJ Ex. D8 at ¶ 8. Because Mr. Regan was not the decisionmaker, Mr. Walker's claim against him cannot go forward. <u>See</u> <u>Davis v. Pennsylvania State</u>, 244 F. App'x 445, 447 (3d Cir.

---

[8] The Court has already held that two grievances filed by Mr. Walker against Corrections Officer Shaw are not actionable because they lacked temporal proximity to any adverse action. <u>See</u> <u>Walker v. Regan</u>, No. 13-7556, 2015 WL 3604175, at *8 n.7 (E.D. Pa. June 9, 2015) (Doc. No. 65). Further, although Mr. Walker's initial opposition to the removal of his Z-Code was constitutionally protected speech, <u>Mack v. Warden Loretto FCI</u>, 839 F.3d 286, 298 (3d Cir. 2016) (holding that some informal oral grievances by inmates are protected by the First Amendment), once Mr. Walker's protestations became threats, his speech was no longer protected. <u>See</u> <u>United States v. Fullmer</u>, 584 F.3d 132, 154 (3d Cir. 2009) ("[W]hile advocating violence that is not imminent and unlikely to occur is protected, speech that constitutes a 'true threat' is not.").

[9] Mr. Regan makes two arguments in favor of granting summary judgment on the 2013 retaliation claim: (1) that Mr. Walker cannot establish the causation element for a retaliation claim, and that (2) Mr. Regan is entitled to qualified immunity. Because the Court holds that Mr. Walker cannot establish causation, it need not discuss whether qualified immunity applies to this claim.

2007) (per curiam) (affirming grant of summary judgment where defendant "did not make" the adverse decision).[10]

Moreover, nothing in the record reflects that the prison superintendent based his decision on Mr. Walker's protected conduct. Indeed, Mr. Regan was not the only prison official who voted to recommend that Mr. Walker receive an H-Code designation; seven other prison officials—each with a vote equal to Mr. Regan's—all voted to recommend Mr. Walker receive an H-Code. See MSJ Ex. D4-2; see also MSJ Ex. D4 at ¶11; MSJ Ex. D6 at ¶5; MSJ Ex. D8 at ¶8. Although the record does not show how heavily the superintendent weighed each prison official's vote, the record is replete with statements from the voting officials confirming that Mr. Walker's unprotected threatening and hostile conduct—and not his other allegedly protected statements—motivated their voting decisions. See MSJ Ex. 4-2; see also MSJ Ex. D8 at ¶ 6–7. Consequently, to the extent that Mr. Walker's protected speech may have influenced Mr. Regan's vote (a conclusion unsupported by the facts), the record still contains no evidence that the protected speech was a substantial factor in the superintendent's ultimate decision.

### III. Mr. Walker's 2014 Retaliation Claim

Unlike Mr. Walker's 2013 retaliation claim, his 2014 claim survives summary judgment. Mr. Walker's 2014 retaliation claim involves protected speech, namely, his filing of the first complaint in this action. Bounds v. Smith, 430 U.S. 817, 821 (1977) ("It is now established beyond doubt that prisoners have a constitutional right of access to the courts."); see also Wolff v. McDonnell, 418 U.S. 539, 579 (1974) (extending right of access to the courts, founded on the Due

---

[10] Mr. Walker does not claim that Mr. Regan's vote—as opposed to the H-Code designation itself—is "adverse action" underpinning the retaliation claim. Because Mr. Walker has not made a claim that Mr. Regan's vote was motivated by retaliation, the Court need not consider whether a prison employee's non-binding vote, in favor of a decision for which the official is not the ultimate decisionmaker, can constitute "adverse action" under First Amendment retaliation precedent.

11

Process Clause, to prisoners filing actions under 42 U.S.C. § 1983 to vindicate "basic constitutional rights").

Mr. Regan disputes that Mr. Walker can satisfy the second two elements: that Mr. Walker experienced adverse action and that Mr. Walker's protected speech was a substantial factor in causing the adverse action. First, although Mr. Regan concedes that the facts establish that Mr. Walker was subject to one actionable adverse action in 2014—the misconduct report—Mr. Regan argues that the precipitating adverse action—the attempted move of Mr. Walker from B-Block to Upper H-Block—cannot support a retaliation claim. Second, Mr. Regan disputes whether Mr. Walker's protected speech was a substantial factor in Mr. Regan's decision to charge Mr. Walker with misconduct. Finally, Mr. Regan also argues that the "same decision" rule applies here, rebutting any showing of causation Mr. Walker might make as to the misconduct adverse action. The Court rejects each of Mr. Regan's arguments as to the 2014 retaliation claim.

A. <u>The Record Contains Facts Supporting that the Attempted Move of Mr. Walker to Upper H-Block Was Adverse Action</u>

Mr. Regan does not deny that he attempted to move Mr. Walker from B-Block to Upper H-Block. See MSJ Ex. D3 at ¶ 11; MSJ Ex. D7 at ¶ 12–14. And, though Mr. Regan argues to the contrary, the record contains enough facts to establish that Mr. Regan's attempt to move Mr. Walker was an actionable adverse action.

Whether discipline is sufficient to constitute adverse action turns on whether it would "deter a prisoner of ordinary firmness from exercising his or her First Amendment rights[.]" <u>Allah v. Seiverling</u>, 229 F.3d 220, 225 (3d Cir. 2000). The decision to move an inmate from one comparable cell to another, on its own, is not adverse action. See <u>Burton v. Rozum</u>, 422 F. App'x 140, 142 (3d Cir. 2011) (recognizing that "a transfer to a different cell block may not be an adverse action 'sufficient to deter' an ordinary person from filing a grievance"). But a transfer to more

restricted cell or block may be adverse action. See Lawson v. Crowther, No. 17-39, 2018 WL 6524380, at *3 (W.D. Pa. Oct. 30, 2018), report and recommendation adopted, No. 17-39, 2018 WL 6523185 (W.D. Pa. Dec. 12, 2018) (collecting cases).

Here, there are disputed facts in the record about whether B-Block (where Mr. Walker was initially housed) and Upper H-Block (Mr. Walker's proposed transfer destination) were comparable. Mr. Regan offers only his own statements to support that Upper H-Block and B-Block were both part of the "general population" and that on Upper H-Block Mr. Walker would "continue to receive the privilege of an inmate with a level 3" custody level. See MSJ Ex. D7 at ¶¶ 13–14. Conversely, the declarations of two of Mr. Walker's prison counselors indicate that Upper H-Block was higher security than B-Block. See MSJ Ex. D4 at ¶¶ 3, 10 (stating that once Mr. Walker received H-Code and increased custody level designations he would likely be moved from B-Block "to C Block or D Block or Upper H Block"); MSJ Ex. D5 at ¶ 10 ("The change from a 3YZ to a 4HYZ meant that Mr. Walker would likely not stay on B block but would be assigned to a higher security block . . . such as upper H block."). Mr. Walker also testified that because Upper H-Block was on the "new side" of the prison, it was more isolated than blocks on the "old side," like B-Block. See MSJ Ex. D1 at 66:15–24, 67:1–9 ("Q. Oh. So, your understanding of general population does not include inmates on the new side? A. Correct. Q. And what do you base that understanding? A. My guess is how we live. Whereas though, we all interact with each other. We don't interact on the new side. We can't go over there. We don't see those guys. We don't have activities with those guys. Q. Okay. A. It's like a prison within a prison. Q. It's separate? A. Right. How the RHU would be separate."); see also Walker Decl. at ¶ 39 (describing Upper H-Block as "more restrictive and isolated housing"). Because there is a factual dispute as to whether Upper H-Block and B Block were comparable, the Court will treat the attempted move

13

as a discrete instance of actionable adverse action that had the potential "to deter a prisoner of ordinary firmness from exercising his or her First Amendment rights[.]" Allah, 229 F.3d at 225.

### B. The Record Contains Facts Supporting that Mr. Walker's Protected Speech Was a Substantial Factor in Causing the Adverse Actions

Mr. Regan argues that there are no facts establishing an inference that Mr. Walker's lawsuit caused Mr. Regan to retaliate (both by way of the cell move and the misconduct charge). But the temporal nexus between Mr. Regan receiving the complaint in this action and taking adverse action against Mr. Walker, along with Mr. Regan's and Mr. Walker's history of acrimony, is sufficient to create an inference of causation. "In cases such as this one where 'the temporal proximity is not so close as to be unduly suggestive,' [the court of appeals] ha[s] recognized that 'timing plus other evidence may be an appropriate test[.]'" Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (quoting Estate of Smith v. Marasco, 318 F.3d 497, 513 (3d Cir. 2003)).

Mr. Regan was served the complaint on June 10, 2014. Seventeen days later, on June 27, 2014, Mr. Regan approached Mr. Walker about a transfer, and that same day issued Mr. Walker a misconduct charge. Although that timing alone may not be "unduly suggestive" of causation, three facts in the record also support an inference of causation. Compare Hammond v. City of Wilkes Barre, 628 F. App'x 806, 808 (3d Cir. 2015) (noting two weeks "may be close enough temporally to be probative of causation") with Thomas, 351 F.3d at 114 (finding temporal proximity not unduly suggestive when three weeks elapsed between protected activity and retaliatory action).

First, another significant event in this litigation—Mr. Regan's filing of a motion to dismiss—occurred on June 26, 2014. See Doc. No. 16. Though seventeen days elapsed between Mr. Regan receiving the complaint in this action and the June 27, 2014 altercation, Mr. Regan filed his motion to dismiss just one day before his allegedly retaliatory conduct.

14

Second, the June 27, 2014 dispute between Mr. Regan and Mr. Walker appears to have been their only interaction during the six months that Mr. Walker was on B-Block under Mr. Regan's supervision. See MSJ at p. 15. In other words, for nearly a half a year while Mr. Walker was on B-Block, Mr. Regan and Mr. Walker did not cross paths. That changed suddenly, however, once Mr. Walker sued Mr. Regan, causing Mr. Regan to seek out Mr. Walker for the first time.

Third, although the record does not include a pattern of antagonism by Mr. Regan towards Mr. Walker, the record does show that the two men had a history, including Mr. Regan's 2013 vote in favor of assigning Mr. Walker H-Code status. See MSJ Ex. D7 at ¶ 8.

Read together, these facts—along with Mr. Regan writing up Mr. Walker for misconduct seventeen days after Mr. Walker served the complaint—at least create a dispute as to whether Mr. Walker's protected speech was a substantial factor in causing (1) his attempted relocation and (2) the misconduct writeup. Because Mr. Regan's other arguments are limited only to whether the misconduct charge is actionable, see infra pp. 15–18, and because Mr. Walker has established all of the requisite elements for his retaliation claim stemming from the attempted transfer, see supra at pp. 12–15, the Court denies summary judgment as to the attempted relocation adverse action.

C. There Are Factual Questions as to Whether Mr. Regan Issued the Misconduct for a Legitimate Penological Reason[11]

Mr. Regan argues that because a hearing officer ultimately decided that the misconduct charge was warranted, he has rebutted Mr. Walker's *prima facie* showing and established that the

---

[11] Mr. Regan does not invoke the "same decision" defense by name, but the cases he applies and arguments he makes rely on the Third Circuit Court of Appeals' "same decision" rule analysis. See MSJ at pp. 12–13. Mr. Regan's Answer to the Fifth Amended Complaint does not plead the "same decision defense," see Doc. No. 118, but as stated above, see supra n.7, this Court is not aware of any decision holding that the "same decision" rule is waived if it is not included in a defendant's answer. Further, Mr. Walker has not argued that Mr. Regan waived the defense. Nonetheless, because factual issues preclude the Court from applying the "same decision" rule, the Court need not determine any potential waiver issue here and now.

misconduct report was warranted, absent the protected conduct, for reasons reasonably related to a legitimate penological interest. Where, as here, a prison official argues that a misconduct charge was warranted (and not retaliatory), courts "evaluate the 'the quantum of evidence' of the misconduct to determine whether the prison officials' decision to discipline an inmate for his violations of prison policy was within the broad discretion we must afford them." Watson, 834 F.3d at 426 (citing Carter v. McGrady, 292 F.3d 152, 159 (3d Cir. 2002)). In adopting this approach, the Third Circuit Court of Appeals explicitly disavowed a method sometimes used by other courts, pursuant to which a prison official's showing of only "some evidence of misconduct" can be enough to grant summary judgment. Id.[12] Instead, the Court must follow Watson's command to scrutinize "the force of the evidence," and analyze whether the evidence of misconduct was "clear and overt," in determining whether there is an issue of material of fact. Id. If the facts are disputed, "a plaintiff can make out a retaliation claim even though the charge against him may have been factually supported." Id. (citing Hill v. City of Scranton, 411 F.3d 118, 130 (3d Cir. 2005)).

Mr. Regan asserts that when he approached Mr. Walker about moving cells, Mr. Walker responded by threatening violence. According to Mr. Regan, that threat—and not Mr. Walker's lawsuit against Mr. Regan—was the impetus for the misconduct charge, and Mr. Regan would have made the same decision—to discipline Mr. Walker for the threat—regardless of whether Mr. Walker had filed a lawsuit against Mr. Regan. This argument is unpersuasive because it overlooks the factual holes in Mr. Regan's version of events.

---

[12] See also Watson, 834 F.3d at 427–31 (Ambro J., concurring). Mr. Regan cites to a handful of unpublished cases applying this abrogated approach, because in those cases the courts granted or affirmed summary judgment based on a finding that the plaintiff prisoner was guilty of the underlying misconduct charge. MSJ at 12–13.

16

The "quantum of evidence" on which Mr. Regan relies is very limited. Unlike the Third Circuit Court of Appeals' decision in Carter v. McGrady, where the court applied the "same decision" rule because the evidence of misconduct was "clear and overt," 292 F.3d at 159, here, the only evidence offered by Mr. Regan is his own account of his interactions with Mr. Walker. See MSJ Ex. D7 at ¶¶ 12–14. Mr. Walker, for his part, denies Mr. Regan's recollection.

In addition to the parties' "he said, he said" description of the altercation, the resultant hearing and appeal of the hearing decision on the misconduct charge do not establish "clear and overt" evidence that the misconduct charge was warranted. First, the hearing officer's initial review of the misconduct charge was limited to consideration of only Mr. Regan's and Mr. Walker's versions of events, see generally MSJ Ex. D9, and the decision was affirmed because "there is no reason for U.M. Regan to lie – and he did have the correct cell." Id. at p. 8. Prison records indicate that when Mr. Walker challenged the misconduct charge, he specifically requested assistance with that challenge but was summarily denied. Id. at p. 4 (Mr. Walker "can provide his own defense."). At bottom, the hearing officer appears to have taken Mr. Regan at his word. The hearing officer's decision, therefore, is not "clear and overt" evidence of anything.

Second, even after the hearing officer affirmed the misconduct charge, Mr. Walker sought further review of the decision, including filing an inmate grievance against Mr. Regan and appealing the hearing officer's decision to the prison superintendent. Id. at pp. 9–13. In the prison superintendent's response to Mr. Walker's appeal, the superintendent issued an order modifying Mr. Walker's punishment; instead of a 90-day sentence in restricted custody, Mr. Walker received only 60 days. Id. at p. 10. Although the superintendent's decision did not include an explanation, the sentence reduction could be construed by a factfinder as evidence calling into question whether the misconduct charge was warranted. Taken together, the (1) lack of witnesses to the June 27,

17

2014 incident other than Mr. Walker and Mr. Regan, (2) the fact that the prison hearing officer's review was extremely limited, and (3) the superintendent's modification of Mr. Walker's punishment all demonstrate that "a reasonable fact finder could conclude that the misconduct was issued in retaliation for [Walker's protected speech], and not in furtherance of legitimate penological goals." Watson, 834 F.3d at 426. Mr. Regan therefore has not carried his burden and the Court will deny summary judgment as to the misconduct adverse action.

### III. Punitive Damages

In an action pursuant to § 1983, punitive damages are appropriate "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). Mr. Regan argues that, as a matter of law, Mr. Walker is not entitled to punitive damages because "Mr. Walker cannot adduce any facts indicating that Unit Manager Regan had an evil motive or that his conduct was recklessly or callously indifferent to [Mr.] Walker's federally protected rights." MSJ at p. 16. But as Mr. Regan himself acknowledges, a defendant's state-of-mind is a factual question typically reserved for the factfinder. See, e.g., Southersby Dev. Corp. v. Borough of Jefferson Hills, 852 F. Supp. 2d 616, 637 (W.D. Pa. 2012) ("[W]hether or not the plaintiff is entitled to punitive damages is [] typically a question of fact for the jury to resolve."). Here the Court will leave for another day the question of whether Mr. Regan was reckless or callously indifferent to Mr. Walker's well-established right to access the courts. See Wolff, 418 U.S. at 579 (establishing in 1974 prisoner's right to access courts using § 1983).

### CONCLUSION

Shawn Walker has the right to speak freely, even in an environment subject to substantial limitation. But the distinction between use and abuse of that right is significant, as the record here

18

establishes. Mr. Walker abused the right in July, 2013, and so his first retaliation claim is dismissed. But Mr. Walker may have properly used the right in 2014, and so his second retaliation claim lives to fight another day.

For those and the foregoing reasons, the motion for summary judgment is granted in part and denied in part. An appropriate order follows.

BY THE COURT:

 /s/ Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE